H. P. PAYNE, et al. v. JOHN O. FOWLER, et al.

Middle Section. December 6, 1930.

450

L. N. Spears and C. C. Moore, of Chattanooga, for complainants.
Rankin, Frazier & Roberts, of Chattanooga, for defendants.

DeWITT, J.   Defendants John O. Fowler and J. G. Sterchi have appealed from the decree awarding recoveries of them on notes given by J. M. Minish and R. W. Gray for purchase of shares of stock in the Dunlap Furniture Manufacturing Corporation.   The notes sued on bore different dates, ranging from December 27, 1926 to January 28, 1927, and were in the regular form of commercial collateral notes; and each note was given for eighty per cent of the par value of the corporate stock attached as collateral, and it represented the consideration for the sale of the stock.   In other words, the note was given for purchase of the stock and the certificate of stock was attached to the note by way of pledge of the stock as security.   The stock afterward became worthless through the failure and bankruptcy of the corporation.

The bill contined the allegation that, prior to the execution of the notes, J. M. Minish and R. W. Gray had entered into an agreement with John O. Fowler and J. G. Sterchi "to embark in the joint venture of acquiring control of the Dunlap Furniture Manufacturing Corporation from the complainants and other stockholders at the price of eighty per cent of par for their stock, said purchase to be made by the said Minish and Gray for themselves and the

said Fowler and Sterchi, as their associates.'' The gravamen of the suit was that Fowler and Sterchi were silent partners with Minish and Gray in the purchase of the stock from complainants.

Demurrers were filed by Fowler and Sterchi; but were overruled with leave to rely upon the grounds of demurrer in their answers. The bill was amended by adding the charge that Fowler and Sterchi were liable to complainants upon a contract made by them, for failing to keep the factory of the corporation in operation for five years, and for mismanagement and for failure adequately to finance the corporation.

The allegations of the bill as amended were taken as confessed by Minish and Gray, they having failed to appear and defend; but no decree was rendered on the notes against Gray, for failure to obtain personal service of process upon him.

Fowler and Sterchi, in their answer, alleged that complainants sold their stock to Minish and Gray and not to Fowler and Sterchi; denied that Minish and Gray bought the stock and signed the notes, on behalf of themselves and of Fowler and Sterchi; denied that Fowler and Sterchi were parties to the contract of purchase, and averred that the notes of Minish and Gray were given and accepted in full payment of the purchase price; that after Minish and Gray had contracted to buy the stock and had bought it Minish and Gray agreed to transfer portions of their stock to Fowler and Sterchi as a bonus for large loans of money to the corporation, with the distinct agreement and understanding that Fowler and Sterchi did not assume payment of the purchase money notes; that the stock at that time was of little or no value and that in as much as the stock was held as collateral by complainants there was nothing of value represented by the transfer of said bonus stock. In the answer these defendants denied any partnership or joint adventure, and further alleged that the complainants by executing a written contract of sale and by accepting the individual notes of Minish and Gray, and signing the transfer of the stock certificates and attaching the same to the individual notes of the purchasers (all of which was relied on by Fowler and Sterchi), had estopped them to claim liability against Fowler and Sterchi.

In the original bill a demand for a jury was made. On account of the incompetency of the Chancellor, the cause was transferred to the Circuit Judge, sitting as Chancellor, at the next term of the Circuit Court. The cause was tried to a jury and on some of the issues the court directed the jury to return answers favorable to the defendants. On other issues the court refused so to direct answers and these issues being submitted to the jury were decided favorably to the complainants. A decree was entered accordingly in favor of the several complainants for principal, interest and

attorneys' fees on the notes. A motion for new trial was duly made and was overruled.

The issues submitted and the answers thereto were as follows:

"First: Did complainants own shares of stock in the Dunlap Furniture Manufacturing Corporation, as charged in their bill? A. Yes, by direction of the court.

"Second: Did defendants, J. G. Sterchi and J. O. Fowler, enter into a joint agreement with defendants, J. M. Minish and R. W. Gray, for Minish and Gray to buy a majority of the stock of the Dunlap Furniture Manufacturing Corporation, to be owned by all four of them in equal parts? A. Yes.

"Did J. M. Minish and R. W. Gray buy complainants' stock in the Dunlap Furniture Manufacturing Corporation and execute notes therefor on behalf of J. G. Sterchi and John O. Fowler and themselves? A. Yes.

"Third: Did defendants, J. G. Sterchi and John O. Fowler agree with J. M. Minish and R. W. Gray that all dividends earned on such stock taken by either of them under said agreement should be first applied to pay complainants and other stockholders for their stock in the name of Minish and Gray? A. Yes, by direction of the Court.

"Fourth: At the time of making this joint agreement for an equal share in the stock of the Dunlap Furniture Manufacturing Corporation, did J. G. Sterchi and John O. Fowler have notice of the consideration to complainants for the sale of their stock was the obligation of the purchasers to retain and operate the furniture manufacturing plant of said company at Dunlap, at its present location, for five years to full capacity and without interruption, unless due to causes over which they had no control, except such as necessarily occur in the operation of such business, and to see that the business is run in a business-like way with prudence and care, and to liquidate the indebtedness of the company as fast as it can properly be done, and to undertake to finance and run the business of the company in such a way as to avoid, as far as possible, the creation of unnecessary indebtedness and keep down expenses as much as possible? A. Yes, by direction of the court.

"Fifth: Did defendants, J. G. Sterchi, as president, John O. Fowler, as secretary and treasurer, and J. M. Minish, as superintendent, or either, control operations of the company from about the time of the purchase of complainants' stock until the company was put in bankruptcy? A. Yes, by direction of the Court, with Minish in active management.

"Sixth: Did defendants, J. G. Sterchi, as President, John O. Fowler, as Secretary, and J. M. Minish, as Superintendent, or either (not material to answer as to Minish, Darr, Judge)—

"(a) Retain and operate the plant, to full capacity without interruption, except for causes over which they had no control, for five years? A. Yes, as to Sterchi and Fowler, by direction of Court.

"(b) Did they run the business in a business-like way, with prudence and care? A. Yes, as to Sterchi and Fowler, by direction of court.

"(c) Did they finance the company so as to avoid the creation of unnecessary indebtedness? A. Yes, as to Sterchi and Fowler, by direction of court.

"(d) Did they liquidate the indebtedness of the company as it could properly be done? A. Yes, as to Sterchi and Fowler, by direction of court.

"(e) Did the failure of the said defendants to do either of the above destroy the value of the stock of the company held by complainants as collateral to their notes? A. No, as to Sterchi and Fowler, by direction of the court."

It is insisted that the court erred in submitting the case to a jury over the objections of defendants, the complainants having waived a jury by failing to file issues of fact as required by Rule 13 of the Chancery Court. This rule provided that demand must be made for a jury in the pleadings or in open court on or before the first day of the term at which the cause is for trial, and the party demanding the jury must at the same time file with the Master the issues which he proposes, furnishing the opposing counsel with a copy; that the Clerk and Master will then pass the file to the Chancellor, who will determine the issues to be submitted to the jury, and unless both the demand and the issues are so made and entered of record, a jury trial will be conclusively deemed to be waived; provided additional issues be submitted at the hearing being deemed proper and material by the court.

The cause came on for trial on the 22nd day of May, 1929, which was the beginning of the Chancery Court during the time of the holding of the Circuit Court. The first day of the term of the Circuit Court had passed by. The demurrers had been overruled on January 25, 1929; the defendants were allowed until the third Monday in February in which to answer. The record does not show the date of the filing of the answer of Fowler and Sterchi. The answer may have been filed on the day on which the cause came on to be tried. The issues could not be made up until the answer was filed. So far as the record shows, May 22, 1929, was the first day of the term at which the cause was for trial. The

complainants therefore were entitled to a jury trial. They submitted their issues in due time. The rule was manifestly adopted to prevent delay in the making up of issues at the hearing. It was clearly a proper exercise of discretion on the part of the Circuit Judge acting as Chancellor to permit the issues to be formulated after the answer was filed and on the first day on which the case stood for trial.

It is insisted that there is no evidence to sustain the verdict of the jury nor the decree of the court; and that the court erred in refusing to grant peremptory instructions in favor of defendants Fowler and Sterchi on all of the issues submitted to the jury, and in refusing to dismiss complainants' bill at the conclusion of the trial. It is also insisted that the Court erred in not holding that the complainants had accepted the notes of Minish and Gray in settlement of their stock with knowledge that defendants Fowler and Sterchi were their prospective associates, and had thereby elected to look to Minish and Gray, and to no one else, for payment; and for this reason could not recover against Fowler and Sterchi in any aspect of the case.

These propositions will be considered and disposed of together.

It appears that sometime prior to December, 1926, Dunlap Furniture Manufacturing Cororation had been chartered and organized under the laws of the State of Tennessee, for the purpose of manufacturing and selling furniture, and that quite a large number of citizens living in and near Dunlap had purchased stock in said corporation. It was promoted chiefly by J. M. Minish and R. W. Gray, who had had experience in the manufacture and sale of furniture. In December, 1926, the corporation owed debts that were pressing and was in need of money to finance its operation. There was no mortgage or lien against its plant and it operted its business for the three months expiring December 31, 1926, at a net profit of $1417.76. Its general indebtedness amounted to nearly $50,000. Minish and Gray were managing the business. There is evidence that unless they could obtain new capital the corporation could not continue in business. About December 13, 1926, a meeting of the directors was held and they discussed the matter of how and where to get new capital. Minish and Gray suggested that a mortgage be placed on the plant to get operating money, but that was objected to. Thereupon Mr. Minish proposed that if complainants would sell their stock or get for him 51% or more of the capital stock he could arrange to borrow money and give a mortgage on the plant. He was then told that if he could make such arrangements those present in the meeting would agree to them. Messrs. Minish and Gray went to Chattanooga. They first called on John O. Fowler, a furniture dealer at the store of

Sterchi Brothers and Fowler, for the purpose of inducing Mr. Fowler and Mr. Sterchi to become interested, explaining that Minish and Gray had the control of the majority of the capital stock. Together they went with Mr. Fowler to the Read House and called on Mr. J. G. Sterchi. The proposition made to Fowler and Sterchi by Minish and Gray was that if Fowler and Sterchi would loan the Company $25,000 as a working capital they would give one-half of the stock which they purchased to Fowler and Sterchi, and that the profits which the business could earn would pay for the stock in less than twelve months. Early the next morning Mr. Sterchi went to Dunlap, made an inspection of the plant and agreed for himself and Fowler to accept the proposition made by Minish and Gray. He returned to Chattanooga and told Fowler of his agreement and left instructions for Fowler to carry out the details of investigating title, preparing contracts, etc. Minish and Gray then advised the stockholders that they had arranged for persons with capital to be associated with them who would advance the necessary operating capital, on condition that not less than 51% of the stock of the Company was turned over to Minish and Gray and their associates at the price of 80 cents on the dollar, for which Minish and Gray would execute notes due in five years and pledge the stock of the Company as security. Accordingly the stockholders procured a contract to be drawn up between themselves and Minish and Gray, the contract being dated December 17, 1926. It was drawn by Hon. Foster V. Brown of the Chattanooga Bar.

This contract is as follows:

"This contract this the 17th day of December, 1926, entered into by and between R. W. Gray and J. M. Minish, parties of the first part, and H. P. Payne, D. M. Harris, S. B. Wilson, C. E. Burrow, Joe Anderson, E. Durham, P. B. Smith and J. B. Smith, and all others who may sign and execute this contract, parties of the second part, witnesseth as follows:

"1. The parties of the first part have agreed to purchase all the stock owned by the parties of the second part herein named, and who, as before recited, may sign this contract, in the Dunlap Furniture Manufacturing Company of Dunlap, Tennessee, at the price of eighty cents (80 cents) on the par value of the stock. The parties of the first part will execute and deliver their promissory notes to the owners of the stock so purchased, payable to the respective owners five years after date of the notes. The notes to draw interest at the rate of six per cent (6%) per annum, interest payable annually at the bank at Dunlap, the notes to be secured by attaching the certificate of stock as collateral for the payment of the respective notes. The notes may become payable and due on the

terms hereinafter set forth before the expiration of the five years.

"II. It is the intention of the purchasers of stock to secure a controlling interest in the stock of the company, and they will buy all of the stock of the company on the same terms as herein set forth of those who do not sign this contract within a reasonable time after the execution of this contract, and on the same terms as herein set forth, and it is the intention of the purchasers of the stock to secure by mortgage on the company's plant a loan of as much as twenty-five thousand ($25,000) dollars for the purpose of paying off a part of the company's indebtedness, and also to furnish working capital.

"III. The parties of the first part obligate themselves to retain and operate the plant at Dunlap at its present location for five years, and to full capacity and without interruption unless due to causes over which they have no control, except such interruptions as necessarily occur in the operation of such business.

"IV. The parties of the first part also obligate themselves as in control of the majority of the stock of the company to see that the business of the company is run in a business-like way, and with prudence and care, and to liquidate the indebtedness of the company as fast as it properly can be done, and will undertake to finance and run the business of the company in such a way as to avoid as far as possible the creation of unnecessary indebtedness, and will keep the expenses down as much as possible, and to this end obligate themselves that the salaries of the officers of the company shall not exceed ten thousand ($10,000) dollars per year for and during the next five years from this date.

"While the notes executed for the purchase of the stock on their face value in five years after date, the notes, at the option of the holders thereof may be declared due and payable in the event, during the five years' period, the property of the company shall be sold or the control should pass from the hands of Gray and Minish and their associates into the hands of other parties, also in case of fire the said notes shall become due and payable or the plant rebuilt on the same site.

"V. This contract is to become binding when the parties of the first part shall with the stock now owned by them obtain an amount of the stock which shall give them controlling interest in the stock of the company.

"Executed in duplicate, this the 17th day of December, 1926."

(Signed by 31 stockholders and by R. W. Gray and J. M. Minish.)

Mr. Brown before he wrote this contract, investigated the corporation in person. He visited Dunlap and attended an informal meeting of stockholders. They disclosed to him what the plan was and after this meeting he drafted the contract, dating it December 17, 1926. He testified that neither in the original conversation with stockholders nor in their meeting was there any discussion as to Minish and Gray having any associates.

On December 15, 1926, Mr. Sterchi came to the plant at Dunlap in company with Mr. Minish. He made some investigation of the property and returned with Minish to Chattanooga. There is testimony that a day or two later Messrs. Minish and Gray began their effort to purchase the controlling interest in the capital stock. The contract was drafted by Mr. Brown as a part of this plan and arrangement. It was signed by all the signers by December 18th. Thereafter the selling stockholders brought their certificates for transfer and execution of the notes. The first transfer was made on December 27th of the shares sold by the complainants, 84 shares were reissued to Mr. Sterchi and 87 shares to Mr. Fowler.

On or about December 20, 1926, Mr. Fowler took the contract drawn by Mr. Brown to his attorney, Mr. Ed. Finley. Mr. Finley testified that Mr. Fowler told him of an agreement on the part of himself and Mr. Sterchi to lend $25,000 to the corporation on the security of a first mortgage on its property; and that he employed him to attend to all the legal details of it, all of which he did. He caused a meeting of stockholders to be held for the purpose of authorizing the execution of the mortgage and electing directors. A directors' meeting was also held. Mr. Finley attended these meetings. He testified that Mr. Fowler came with him once and Mr. Sterchi came with him once; and that the persons present at the meetings understood that he was representing Messrs. Fowler and Sterchi. He said that Fowler and Sterchi had no contract with Minish and Gray prior to the contract which he drafted, dated December 31, 1926, and which is as follows:

"Whereas, the Dunlap Furniture Manufacturing Company reached a point where it was no longer able to finance the operations of its plant without financial assistance; and,

"Whereas, the large number of stockholders in said corporation prevented any concerted action on the part of said corporation; and,

"Whereas, on the 17th day of December, 1926, J. M. Minish, who is a large stockholder in said Company and R. W. Gray, who has been handling said Company's sales, jointly entered into a written contract for the purchase of certain stock in

said Company so that they would have voting control of said Company, a copy of said contract being hereto attached and made a part hereof as Exhibit A; and,

"Whereas, J. M. Minish and R. W. Gray have asked J. G. Sterchi and John O. Fowler to make a first mortgage loan of $25,000 to said Company, and have otherwise asked them to assist in the financing of said Company, and

"Whereas, J. G. Sterchi and John O. Fowler have consented to make said loan and to procure such line of credit as they believe the Company is entitled to, provided J. M. Minish and R. W. Gray will transfer, assign and deliver to J. G. Sterchi and John O. Fowler in equal shares one-half ($\frac{1}{2}$) of all of the stock which they now own, jointly or severally, in the aforesaid Company, or which they may hereafter acquire under Exhibit A or in any other manner; and

"Whereas, the aforesaid parties have reached an agreement relative to all the foregoing;

"Now, therefore, this instrument, witnesseth:

"The said J. M. Minish and R. W. Gray, for one dollar ($1) cash in hand paid to them, receipt of which is hereby acknowledged, and other valuable considerations, do hereby transfer, assign and deliver, in equal shares, one-half ($\frac{1}{2}$) of all the stock which they now own; either jointly or severally, or which they may subsequently acquire in the aforesaid Company, to the said J. G. Sterchi and John O. Fowler. It is, however, specifically understood and agreed that the said J. G. Sterchi and John O. Fowler do not assume any liability for the purchase price of stock enumerated in Exhibit A or any other stock purchased under this agreement, even though issued in their name,

"It is further understood and agreed between the parties hereto that all dividends paid on any stock now listed in Exhibit A or hereafter to be listed therein, or hereafter acquired under said agreement, shall be used in paying the purchase price of said stock, it being the intent and purpose of this contract to cause the net earnings of the Company, so far as they will go, to pay the purchase price of said stock, and the parties hereto cannot draw any dividends or any of said stock mentioned until said purchase price, with interest, is paid.

"It is further understood and agreed that R. W. Gray, by execution of this instrument, releases and cancels the sales contract that he now has with said Company.

"It is further understood and agreed that each of the parties hereto will have the right to vote one-fourth each of all the

stock standing in any and all of their names, whether said stock was acquired before or after execution of Exhibit A or the execution of this instrument, it being the intent of this contract that each party hereto shall have equal rights in the control and management of said business in so far as the stock owned or controlled by them jointly will permit.

"It is further understood and agreed that any additional stock purchased under Exhibit A or in any other manner by any of the parties hereto shall at the option of the other parties be equally prorated among them.

"In witness whereof the parties have executed this agreement in triplicate this 31st day of December, 1926.

"John O. Fowler,

"J. M. Minish,

"R. W. Gray,

"J. G. Sterchi."

While it is true that complainants knew that Fowler and Sterchi were lending the money and that stock was being transferred to them, none of them requested them to sign the notes or to become liable for the purchase of the stock. In the transition from the old management to the new, Mr. Finley had officers elected temporarily to execute the mortgage and loan notes to Fowler and Sterchi; and as soon as these papers were executed, these temporary officers resigned and J. G. Sterchi was elected president and John O. Fowler secretary and treasurer of the Company. Mr. Fowler testified that he did not endorse his name on the certificates for transfer as collateral; nor did he authorize this to be done; but he learned that it had been done. He acted as a stockholder and made no objection.

After the execution of the contract of December 31st, the loan of $25,000 was made by Fowler and Sterchi and the mortgage taken. They also loaned to the corporation, in various sums, about $8,000 as unsecured operating loans. In February, 1927, they loaned the corporation $12,500 on a second mortgage. They served as officers of the Company without pay. By July, 1927, the business had been increasingly unprofitable, Sterchi and Fowler refused to make further loans. The affairs of the corporation were wound up in the Court of Bankruptcy. Sterchi and Fowler, at the request of the trustee in bankruptcy, submitted an offer to buy the property, which was accepted. The plant itself was bought for the amount of the mortgage debts. The manufactured goods on hand, which were inventoried at $30,400, were bought in by Fowler and Sterchi for $6,000.

The finding of the jury is that Minish, Gray, Sterchi and Fowler engaged in the joint adventure of acquiring control, and operating

the Dunlap Furniture Manufacturing Corporation for a profit, and that the stock of the complainants was bought in the name of Minish and Gray, but for the benefit of all four of them as joint adventurers. If there is material evidence to support these findings, all four of them are liable for the purchase price.

For the defendants it is insisted that there is no evidence that the complainants have any contract whatever with Sterchi and Fowler; that no witness said that when Mr. Sterchi investigated the property on or about December 15, 1926, any contract had been made with Sterchi and Fowler. They insist that all that is shown is that in consideration of Sterchi and Fowler loaning those large sums of money, which no bank would do, and to save the Company from impending failure, Minish and Gray agreed to convey to Sterchi and Fowler each one-fourth of the stock which they acquired from the stockholders, it being understood that the stock was subject to the lien for purchase money; that the contract shows the the stock was to be owned separately, not jointly. It is to be observed that the contract provides:

"It is, however, specifically understood and agreed that the said J. G. Sterchi and John O. Fowler do not assume any liability for the purchase price of the stock enumerated in Exhibit A or any other stock purchased under this agreement, even though issued in their name."

It is also to be observed that the contract provided that the voting privilege might be exercised by Fowler and Sterchi even though the stock might not be in their names on the books of the corporation. This was probably done because the stock was already collateral to purchase money notes and might, therefore, not be available for transfer to the respective parties. It must be inferred from the evidence that Sterchi and Fowler knew that Minish and Gray had acquired this stock by purchase and not by way of gift; that they knew that the complainants held the notes for the purchase money, with the very certificates of stock attached which were the evidences of the ownership by Sterchi and Fowler. They were new parties acquiring substantial interests, taking mortgages for large sum loans, assuming the management of the business, voting as stockholders and directors. They knew that Minish and Gray did not hold the stock purchased, that they owed money for it, and that it would have to be paid for. Minish and Gray are insolvent and probably were at that time. When they told the other stockholders that they could obtain funds to re-finance the corporation provided they could obtain the majority of the stock, it was not to be on the basis of a gift, or surrender of the stock without consideration, but of payment of money for it to the extent of eighty per cent of its par value. But the plan was for the stock to be paid for out of dividends. The complainants manifestly knew

that unless some desperate effort were made to obtain money, their stock would be worthless.

For the complainants it is contended that the clause in the second contract, that any dividends on the stock should be used to pay the purchase notes, is an evidence that a partnership existed. The rule is that in the absence of an agreement to the contrary, a pledger of shares of stock as collateral security carries with it, as an incident of the pledgee's special ownership, the right to receive dividends afterward declared, to be applied on the debt. 6 Fletcher's Cyclopedia of Corporations, sec. 3704, p. 6151.

The contract contained the recital, "it being the intent and purpose of this contract to cause the net earnings of the company, so far as they will go, to pay the purchase price of said stock, and the parties hereto cannot draw any dividends on any of said stock mentioned until said purchase price, with interest, is paid."

The contract embodied a transfer by Minish and Gray to Fowler and Sterchi, in equal shares, of one-half of all the stock which they then owned, either jointly or severally, or which they might subsequently acquire; with the aforesaid provision for non-liability of Fowler and Sterchi for the purchase price.

Upon its face, all of this was but an agreement on the part of Fowler and Sterchi to make to the corporation a loan of $25,000 and to procure a line of credit, and to have each one-fourth of the stock of Minish and Gray, subject to the lien for the purchase money. The provision that dividends be applied on the purchase price was but conformable to the law. We fail to see how it is evidence of an agreement of partnership. For persons to be partners they must be co-owners. Chapter 140, section 6, Acts of 1917. Section 7, subsection (2) of said Act is as follows:

"Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property."

A partnership is always created by a voluntary agreement of the parties, and not by operation of law. H. T. Hackney Co. v. Robert E. Lee Hotel, 156 Tenn., 243, 300 S. W., 1; Pritchett v. Plater & Co., 144 Tenn., 406, 232 S. W., 961. It, of course, may grow out of the acts and recognitions of persons in the conduct of a common or joint business. Foster v. Hall, 4 Humph., 346; Kendrick v. Cisco, 13 Lea, 247.

A joint adventure is similar to a partnership and governed by the same rules. Pritchett v. Plater &. Co., supra. The essence of each is a joint ownership.

It is contended that the following clause in the contract of Minish and Gray with Sterchi and Fowler shows an intention to engage in

a partnership or joint adventure by joint acquisition and ownership of the stock:

"It is further understood and agreed that each of the parties hereto will have the right to vote one-fourth each of all the stock standing in any and all 'of their names, whether said stock was acquired before or after execution of Exhibit A or the execution of this instrument, it being the intent of this contract that each party hereto shall have equal rights in the control and management of said business in so far as the stock 'owned or controlled by them jointly will permit."

In our opinion, the only reasonable construction of this paragraph is that Sterchi and Fowler were to own and hold their shares of stock in severalty, and that each of said persons was to hold one-fourth of the stock. There was no stock issued to any two or more of them jointly. They were to have, and did have separate, individual stock, subject to the contract of pledge. The agreement was that each should vote one-fourth of the stock, but that all together should have voting control of the corporation. This did not create a joint acquisition or ownership of the stock. The courts will not impose by implication any duty or obligation which is not reasonably and naturally inferable from the terms of the contract. 33 C. J., 847, note 8 (a) and cases cited.

A joint adventure, that is, a partnership for a single enterprise, involves as a necessary element such a relation between the parties as constitutes each the agent of the other or others. Virginian Railroad Co. v. Farr, 147 Va., 217, 136 S. E., 668.

There is no evidence that the complainants contracted to sell their stock upon faith of any obligation of Sterchi or Fowler to pay any of the purchase price; nor that Sterchi and Fowler assumed any obligation for it; nor that they held out Minish and Gray as their agents for the purchase of it; nor that they authorized Minish and Gray to purchase for them stock from the complainants.

The only reasonable interpretation of the instruments and the testimony is that Sterchi and Fowler agreed to make a loan to the corporation upon the security 'of a mortgage of its property in consideration of the transfer to each of them of one-fourth of the stock purchased by Minish and Gray subject to the lien for purchase money, any dividends thereon to be applied to the purchase money notes; and with the express provision that Sterchi and Fowler would not be personally liable for any of the purchase money. The undisputed evidence is that they expected that by prudent management under their control the factory would be successful so as to produce in the period of five years sufficient dividends to pay for the stock.

It is very significant that the notes sued on bore the signatures only of Minish and Gray, and that they were executed after the

payees had learned that Sterchi and Fowler were preparing to finance the corporation. There is no evidence that complainants were told that Sterchi and Fowler were to become liable for the purchase price of the stock.

Complainant Payne testified over objection as follows:

"Q. 17. At that time did they tell you they had made arrangements with Sterchi and Fowler? A. No, they didn't say they had made arrangements with Sterchi and Fowler; said they had made arrangements.

"Q. 18. What arrangements did they say they had made? A. They said they had made arrangements to borrow all the money we needed, I believe; I don't remember that they specified even twenty-five thousand dollars; all the money we needed to operate the factory.

"Q. 19. Any conditions attached to their getting that money? A. Yes, sir; they would have to have 50 per cent of the stock.

"Q. 20. Did they say what price they were willing to pay for the 50 per cent? A. Eighty cents on the dollar.

The date of the conversation of this witness with Minish and Gray was about December 15, 1926, when they returned from their visit to Sterchi and Fowler. This testimony did not tend to show that the persons who were to loan the money were to buy stock. The reasonable interpretation of it is that Minish and Gray had to have fifty per cent of the capital stock in order to be able to arrange to borrow the money. We do not see that the admission of this evidence was error, but we think that it had no probative value as tending to hold Sterchi and Fowler liable.

In support of the verdict and judgment, counsel for appellees rely upon the following Tennessee decisions:

Nichols v. Cheairs, 4 Sneed, 229; Gavin v. Walker, 14 Lea, 649; Pritchett v. Plater, supra.

In the first two of these cases dormant partners, unknown to the creditors, were held liable on notes executed by the active partners. In the Pritchett case the decision was based on the ground that Messrs. Pritchett and Stockell were joint owners, or partners, engaged in the purchase, ownership and sale of stock in a corporation.

These decisions are not apposite, for they involved the partnership relation. We hold that the Acting Chancellor should have sustained the motion for peremptory instructions in behalf of the defendants Sterchi and Fowler. It results that as to them the decree is reversed, the verdict set aside, and the bill is dismissed at the cost of complainants.

Faw, P. J., and Crownover, J., concur.